Filed 7/13/23  P. v. Moore CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DAVID LEE MOORE,<br><br>Defendant and Appellant. | F082544<br><br>(Super. Ct. No. BF172121D)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Solomon Wollack, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Jeffrey D. Firestine, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant David Lee Moore entered an illegal gaming business with three other gang members and robbed the business at gunpoint. While fleeing, the four robbers shot at a security guard and wounded him in the leg. A jury convicted defendant of attempted murder, second degree robbery, assault with a firearm, conspiracy to commit robbery and assault with a firearm, and unlawful possession of a firearm by a felon and found true multiple firearm and gang enhancements.

After defendant's trial, the Legislature substantially amended the statutes applicable to gang enhancements and sentencing. The parties agree that the gang enhancements should be reversed and remanded to the trial court for further proceedings and that defendant is entitled to resentencing under the amended sentencing statutes. The parties also agree that the trial court erred in instructing the jury that it could find defendant inflicted great bodily injury if he proximately, rather than personally, caused such injury and ask that we strike the enhancement.

Defendant argues that we must reverse his conviction for attempted murder because subsequent to trial, the Legislature enacted Penal Code section 1109,[1] which requires bifurcation of his gang enhancements. The People respond that section 1109 is not retroactive and, in any event, the failure to bifurcate is harmless.

We agree that the gang and great bodily injury enhancements should be reversed and that defendant is entitled to full resentencing, but we find that the failure to bifurcate was harmless and otherwise affirm the judgment.

## PROCEDURAL BACKGROUND

The District Attorney of Kern County filed an information on May 30, 2018, charging defendant with attempted murder (§§ 187, 664; count 1), second degree robbery (§ 212.5, subd. (c); count 2), assault with a firearm (§ 245, subd. (a)(2); count 3),

---

[1]     Undesignated statutory references are to the Penal Code.

2.

conspiracy to commit robbery and assault with a firearm (§§ 182, subd. (a)(1), 212.5, subd. (c), 245, subd. (a)(2); count 5), and unlawful possession of a firearm by a felon (§ 29800, subd. (a)(1); count 6).[2] The information also charged that defendant committed the crimes to benefit a criminal street gang (§ 186.22, subd. (b)(1)) as to counts 1, 2, 3, 5, and 6. As to counts 1 and 2, the information alleged that defendant personally used a firearm (§ 12022.53, subd. (b)) and discharged a firearm (§ 12022.53, subd. (c)) causing great bodily injury (§ 12022.53, subd. (d)), or that a principle in the crime did so (§ 12022.53, subd. (e)). The information further alleged, as to counts 3, 5, and 6, that defendant personally used a firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury (§ 12022.7). As to counts 1, 2, 3, 5, and 6, the information also alleged one prior "strike" conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), a prior serious felony conviction (§ 667, subd. (a)), and a prior prison term (§ 667.5, subd. (b)).[3] Defendant pled not guilty to the charges and denied all allegations in the information.

The jury convicted defendant of all charges and found true all enhancements on September 25, 2020.[4] After defendant waived his right to a jury trial as to his prior convictions, the trial court found the prior conviction allegations to be true.

---

[2] The information charged codefendants Frankie Duque Ramos and Eric Frank Grijalva with the same crimes as well as participation in a criminal street gang (§ 186.22, subd. (a); count 4). Anesia Lucia Ribeiro was charged in counts 1, 2, 3, 5, and also with accessory to a crime (§ 32; count 7). Adolfo Rivera was charged by separate information for his involvement in the robbery.

[3] In response to the prosecutor's motion, the trial court dismissed the prior prison term allegations as to all defendants on June 11, 2020.

[4] The jury convicted Ramos of the same charges and found true the same enhancements. However, the jury was unable to reach a verdict as to count 4, which charged Ramos with participating in a criminal street gang. The trial court granted Ribeiro's motion for judgment of acquittal as to attempted murder (count 1) on September 14, 2020. The jury acquitted Ribeiro of assault with a firearm (count 3) and failed to reach a verdict as to the remaining three charges against her. The jury also failed to reach a verdict as to any of the charges against Grijalva.

The trial court denied defendant's motion to dismiss his prior strike,[5] struck the enhancement for a serious felony conviction (§ 667, subd. (a)), and sentenced defendant to a total fixed term of 25 years and four months, plus 50 years to life, as follows: 10 years for attempted murder (§§ 187, 664, 667, subd. (e)), plus 10 years (§ 186.22, subd. (b)(1)), plus 25 years to life (§ 12022.53, subd. (d)), plus stayed terms of 20 and 10 years (§§ 654, 12022.53, subds. (b), (c)); and a consecutive two-year term for robbery (§§ 212.5, subd. (c), 667, subd. (e)), plus three years and four months (§ 186.22, subd. (b)(1)), plus 25 years to life (§ 12022.53, subd. (d)), plus stayed terms of 20 and 10 years (§§ 654, 12022.53, subds. (b), (c)).[6]

As to the remaining charges, the trial court stayed the sentences pursuant to section 654 and sentenced as follows:  the upper term of eight years for assault with a firearm (§§ 245, subd. (a)(2), 667, subd. (e)), plus 10 years (§ 186.22, subd. (b)(1)), plus 10 years (§ 12022.5, subd. (a)), plus three years (§ 12022.7); the upper term of six years for conspiracy (§ 182, subd. (a)(1)), plus five years (§ 186.22, subd. (b)(1)), plus 10 years (§ 12022.5, subd. (a)), plus three years (§ 12022.7); and the upper term of six years for possession of a firearm by a prohibited person (§ 29800, subd. (a)(1)), plus four years (§ 186.22, subd. (b)(1)).[7]

The court also ordered defendant to pay victim restitution (former § 1202.4) as to counts 1 and 2, a $300 restitution fine (former § 1202.4) and a suspended $300 parole revocation restitution fine (§ 1202.45) as to count 6, and $30 criminal conviction (Gov. Code, § 70373) and $40 court operations (§ 1465.8) assessments as to all counts.

---

[5]     See *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

[6]     The trial court ordered count 2 to be served consecutively to count 1 based on the erroneous legal conclusion (discussed later) that the robbery had ended before defendant fired at Eric.

[7]     The trial court dismissed enhancements pursuant to sections 12022.5 and 12022.7 as to count 6 because the jury did not make any finding on them.

Defendant timely appealed on March 12, 2021.

## FACTS[8]

### I.    Testimony of Eric H.

On January 14, 2018, Eric H. was shot twice in his right leg (in his calf and thigh)[9] by individuals who had just robbed a business and whom Eric, in court, identified as defendant, Ramos, and Grijalva.  He also identified a fourth robber who used the nickname Brazer (referring to Rivera).  Eric worked as an armed security guard for a business located on Baker Street near where it crosses Niles Street, in Bakersfield (the business).  The business had formerly been a marijuana dispensary and was converted to an internet café or casino.  The form of gambling which took place at the business is not legal in California.  During his shift, Eric carried both a taser and a nine-millimeter Glock firearm loaded with hollow-point bullets.  He had a second firearm that he kept in his backpack in the office.

Eric testified that defendant, Ramos, Rivera, and Ribeiro (Ramos's girlfriend) had frequented the business previously and also in the hours before the robbery.  The business had security cameras, which recorded the area and encoded the recording with both the date and time, located outside, in the gaming room, in the front room, and in the office.  Eric identified Ramos and Ribeiro in one video as they stood at the front door at approximately 2:00 a.m. the day of the robbery.  He identified Rivera in another video as the individual in a burgundy sweatshirt playing one of the games.  He also identified defendant and Rivera in the gaming room at approximately 3:35 a.m., and defendant, Rivera, and Grijalva in the game room standing together at approximately 4:02 a.m.

---

**8**      We have not summarized all evidence adduced at trial and only summarize evidence relevant to defendant.

**9**      One bullet passed through Eric's leg and the other bullet lodged in his leg.  Eric initially told officers that he believed he was hit with a .22-caliber bullet when interviewed at the hospital but testified that he believed he was hit with a nine-millimeter bullet based upon something a doctor mentioned.

Eric normally worked until 6:00 a.m. but had stayed later on the day of the robbery because he suspected that the business might be robbed. Earlier in the evening, Eric observed defendant staring at Eric's firearm and Ramos asked Eric what he would do if the business was robbed and questioned Eric as to the type of bullet-proof vest he wore. Eric noticed defendant, Ramos, Rivera, Grijalva, and Ribeiro walking in and out of the business, staring at the street, and pointing to the corners and believed these behaviors indicated they were planning a robbery.

Eric identified the robbers in the surveillance video as defendant, Ramos, Grijalva, and Rivera. In the video of the front room, Eric identified defendant ("the gentleman with the long ponytail") as the first individual pointing a firearm at him, Rivera as the individual in the back, Ramos as the individual in the middle, and Grijalva as the fourth individual standing in the doorway.[10] Eric also observed that defendant had a tattoo under his left eye.[11] Eric explained that he was able to recognize the individuals by their eyes and voices, clothing, and shoes because they "were in and out throughout [his 16-hour] shift." Eric testified that defendant had a .22-caliber firearm, Ramos had a Smith and Wesson SD9 model firearm, and Grijalva had a .357-caliber revolver.

Eric was in the front room speaking with another security guard and standing against the wall when the masked robbers entered the business and pointed firearms at him. Eric attempted to unholster his firearm, but it was stuck. One of the robbers said, "That's the guy with the gun." Someone ordered Eric to sit on the ground, and Eric refused. Ramos said, "I'm not fucking around," and fired his Smith and Wesson firearm toward Eric and hit the wall over, and to the left of, Eric's head. Defendant grabbed Eric's firearm—the nine-millimeter Glock loaded with hollow point bullets—and tucked

---

[10]    A still photograph from the video Eric identified as being taken in the front room when the suspects entered the business is attached in the Appendix, *post*, page 41.

[11]    Officer Ian Jones testified that defendant had a tattoo of an "E" under his right eye and an "S" under his left eye.

6.

it into the back of his pants. Defendant stayed with Eric and the other security guard while Ramos and Rivera went into the gaming room. At one point, defendant told Eric, "Don't move or I'll blow your fucking head off." Defendant also attempted to take Eric's taser, but Eric convinced defendant that Eric could not use it to defend himself against a firearm. Grijalva, armed with a snub-nosed revolver, went back and forth between the front and gaming rooms. The robbers took the keys to gaming machines from the office and removed the money. In an interview with detectives, Eric estimated that the robbers obtained approximately $1,600 from the business.

When the robbers left the business, Eric pursued them while armed with only a taser in an attempt to retrieve his firearm from defendant. At the corner of Baker and Niles streets, Eric deployed the taser which made a loud popping noise, like a firearm might make. The robbers immediately fired back at him from approximately 20 feet away. Eric told officers that Ramos shot three rounds, Grijalva ("the one with the Snubnose" revolver) shot an unknown number of rounds, and defendant ("the one with the … .22[-caliber]") shot three or four rounds. During an interview with officers, Eric said that he believed the robbers were trying to scare him. After he saw the video of the shooting, he testified he believed that they intended to kill him. The suspects headed east down Niles Street.

Eric returned to the business, retrieved his second firearm and cellphone from the office, and then headed back to where he saw the robbers fleeing at approximately 7:42 a.m. He turned around and walked past the front door of the business and into an alley. At the time, Eric believed that the robbers were on foot, but then he saw a white Dodge Magnum vehicle that Rivera had driven on several occasions. The white vehicle was in the same alley, approximately one block away, near a convenience store, and being driven by Ribeiro whom Eric identified as Ramos's girlfriend. Eric identified the white vehicle as the same vehicle seen in a surveillance video of earlier that morning, at approximately 4:23 a.m., when defendant and Rivera left the business. Reviewing a

7.

surveillance video from the alley, Eric identified a white vehicle parked at the convenience store at the end of the alley as the same white vehicle that had been earlier parked outside the business.

After the robbery, Eric described his observations to a 911 operator while he also received some information from a customer of the business who had entered the business during the robbery. While on the 911 call, Eric told the dispatcher that the robbers had fired at him and described seeing the white vehicle driving in the area.

Emergency services transported Eric to the hospital after the robbery. Officers brought Ramos to the hospital and asked Eric to identify him. Eric identified Ramos as "the one that took [his] Glock," a description of defendant and not Ramos, and told officers that the individual shown to him was not the individual he knew as Ramos. Eric further stated that defendant was the individual armed with a .22-caliber firearm who had taken Eric's firearm and then shot him. Eric described Ribeiro as wearing black pants and a pink sweater, although surveillance videos of the business shows her wearing light-colored pants and a dark-colored jacket. He saw Ribeiro at the hospital and identified her as Ramos's girlfriend who was driving the white vehicle. However, Ribeiro was dressed in pink pants and a dark-colored jacket, not black pants and a pink sweater.

Eric was released from the hospital after approximately two hours, and the doctor advised him that the bullet in his leg would eventually come out without surgery, but it was still inside him at the time of his testimony. After he was released from the hospital, Eric went to police headquarters for an interview. Initially, Eric told the officer that the robbers headed east on Niles "when they first got *out* of the vehicle." (Italics added.) Eric then explained that he lost sight of the robbers as they headed east on Niles and then he turned around and headed south on Baker (past the business) and into the alley because a customer told him that she had observed them running toward the convenience store (located two blocks east of Baker at the end of the alley). Eric told the officer that he saw the white vehicle at the convenience store and saw Grijalva (the "one that was

8.

carrying the Snubnose") just closing the vehicle door to the left-side back seat and saw Ramos was in the front seat. Eric then saw the vehicle being driven around the area.[12] Eric acknowledged that the video of the alley shows four individuals running into the backyard of a residence and not entering a vehicle.

Early in the investigation, Eric identified Rivera from a photograph lineup but was not able to identify Grijalva. He also identified an individual other than defendant, Ramos, Grijalva, and Rivera as one of the suspects from a photograph lineup.

When cross-examined, Eric acknowledged that he was paid "under the table" and denied knowing that the business was unlicensed until he had been working there a few months. He also testified that he later exchanged words with a woman whom he believed to be Ramos's mother and told her that her relative had injured him.[13] He denied threatening the woman with a gun.

## II. Crime scene investigation.

Sergeant Christopher Bagby responded to the business to investigate the shooting and arrived between 8:00 and 8:30 a.m. Inside the foyer of the business, Bagby observed a bullet hole in the wall and an expended shell casing on the floor. The gambling machines located in the adjacent room had been emptied of money.

The crime scene encompassed the 1200 block of Baker Street and the 700 block of Niles Street. Officers had already marked items of interests with placards. A taco shop,

---

[12] Surveillance video from the alleyway shows that the robbers did not enter the vehicle but jumped a fence along the alley and into the backyard of an adjacent residence. Eric testified that he saw the white vehicle at the convenience store but agreed these events were not captured by the surveillance recording of the alley. We note that while the video evidence does not appear consistent with Eric's testimony that the suspects entered the white vehicle, it does show the white vehicle traveling the streets surrounding the business.

[13] Ramos's sister and her friend later testified that Eric entered a casino where they were present and angrily called Ramos's sister names, pulled out a gun, and said that he would make sure that Ramos received a sentence of life in prison. Both witnesses admitted convictions for crimes of moral turpitude.

located across Baker Street and on the corner of Niles Street, had a fresh bullet strike in the outside wall. An automotive shop was located next to the business, on the corner of Baker Street and Niles, and surrounded by a wall with steel gates at each street. The majority of outside evidence was located on Niles Street beyond the crosswalk. Several items observed on Niles Street resulted from deployment of a taser, including taser-blast doors and white confetti. Confetti was also located in front of a residence (the residence), secured with a surveillance camera and located next to the auto shop.

In front of the auto-shop gate near the residence, officers found an expended hollow-point bullet on the ground and a bullet strike on the gate itself. A hollow-point bullet is designed to expand when it hits in order to prevent the bullet from exiting and causes more damage than other types of bullets. Several bullet casings were also found near the gate. A forensic technician employed by Kern Regional Crime Laboratory examined 11 casings and determined that eight of them were from nine-millimeter Luger bullets and three of them were from .45-caliber bullets.[14]

## III.    Testimony of Jose P.

Jose P. lived off the alley by the business near the Boys and Girls Club and identified his residence from a still photograph obtained from the surveillance video of the alley. At approximately 7:40 a.m. on the morning of the robbery, Jose awoke because his dogs were barking and saw four people in his backyard. He recognized one of the individuals as "Frank [Ramos]," whom he knew from middle school and high school, and another as "Eric [Grijalva]," to whom he was earlier introduced at a casino while Ramos was present. Jose testified that he did not see Ramos or Grijalva in the courtroom but acknowledged that he identified both men when shown photographs by a detective. Jose also testified that he had identified Grijalva as "Eric" in an earlier court hearing. Jose

---

[14]    Trial testimony did not reveal the total number of casings recovered from the scene, so it is unclear if the technician examined all the casings recovered.

acknowledged that he identified a third individual when earlier shown photographs by officers but could not remember identifying a photograph of the fourth man who had long hair. During an interview with Detective Keegan Gavin, Jose identified Ramos, Grijalva, Rivera, and defendant from photographs.

One of the men asked to use Jose's phone, but his phone was not charged. One of the men had a phone and used it to call for a ride. Ramos and Rivera left first, after approximately 10 minutes, and defendant and Grijalva left approximately 20 minutes later. Jose told police officers, during an earlier interview, that Eric told Jose what they had done and later inquired as to whether Jose had retrieved the sweater left in the neighbor's yard.

Afterwards, Jose and his cousin found a walkie-talkie radio on the left side of the alley behind his home (behind the business). The police later searched Jose's residence and found a .380-caliber revolver. Jose told Gavin that he and his wife's cousin found the firearm in the alley but claimed it was found prior to the robbery. Jose later testified that he was "dumpster diving" with his cousin but found the firearm himself.

When originally interviewed by law enforcement, Jose did not want to provide information to the police because he was concerned for his own safety and the safety of his family. Jose expressed concern that the suspects might "put[ ] the word out," and then Jose would have to "be looking over [his] back every time because of this." He testified after being granted immunity by the prosecutor and admitted to having been convicted of several crimes of moral turpitude.

IV.     **Video camera and Facebook evidence.**

   A.      **Video of Suspects at Business Before Robbery and Facebook Communications**

The business had several surveillance cameras which recorded the sidewalk outside the front door, the front door, the foyer, the gaming room, and the office. Surveillance video shows Ribeiro and Ramos were standing outside the business at

approximately 2:01 a.m. and entered and exited the business several times between 2:10 and 2:22 a.m.[15] Video of the gaming room shows Rivera inside playing one of the games at approximately the same time. At approximately 2:16 a.m., video shows that defendant arrived outside the business and met with Ramos and Ribeiro. A few minutes later, Rivera met with them outside the business briefly before returning to the game room. After speaking for several minutes, defendant entered the business with another individual and walked into the game room while Ramos and Ribeiro walked off down the street. Video shows defendant went in and out of the business at approximately 2:32 a.m. The white vehicle used in the robbery was parked in front of the business at approximately 3:10 a.m., and the driver entered the business and met up with defendant and Rivera in the game room.

Defendant and Rivera remained in the business for the next several hours. Gavin obtained Facebook records of defendant and Ramos, which documented messages exchanged between the two men from 3:36 a.m. until 4:51 a.m.[16] At approximately 3:36 a.m.,[17] Ramos asked defendant, "Wyd [What are you doing]?" Defendant responded at 3:37 a.m., "Bored sleepy and [you]?" Ramos replied at 3:37 a.m., "Same wya [where you at]?" Defendant replied at 3:38 a.m., "Baker," and explained at 3:40 a.m., "The place [you] left me at." Ramos asked who was also present and whether Rivera was still there at 3:40 a.m. Defendant responded affirmatively and asked Ramos to bring him a sweater at 3:41 a.m. Ramos asked if Rivera had his car back. Ramos then

---

[15]     We have reviewed the video surveillance evidence and set forth our observations of the individuals who Eric testified were defendant, Ramos, Rivera, Grijalva, and Ribeiro, as we previously described.

[16]     Gavin testified to several messages, occurring during the week prior to the robbery, between Ramos and other individuals in which Ramos discussed obtaining permission from someone to rob the business and his intent to rob the business.

[17]     Gavin testified that the times indicated in the Facebook records had to be converted to Pacific Standard Time by subtracting eight hours.

asked who else was present 3:43 a.m., and at 3:49 a.m., defendant indicated the same people as when Ramos had been there earlier. Ramos asked at 3:49 a.m., "[What] security gaurd [*sic*]?" Defendant replied at 3:51 a.m., "Black dude [Eric] what's good?" Ramos responded that he was just asking what was up at 3:52 a.m. Defendant replied, "Idk [I don't know] I'm ready for any thing [*sic*]." Ramos asked, "U wanna Rob them or what?" Defendant replied at 3:53 a.m., "If u want i give a fucl [*sic*]." Ramos asked for Rivera and instructed defendant to "[t]ell him to call [Ramos] from [defendant's] messenger" at 3:54 a.m. Video surveillance shows defendant used his cell phone in the game room during these messages, handed his phone to Rivera who spoke on the phone for several minutes, and then retrieved his phone from Rivera after the call. The Facebook records also document a call at that time. After the call, defendant messaged Ramos to remind Ramos to bring defendant a sweater.[18]

Surveillance video shows that Grijalva arrived at 4:02 a.m. Defendant, Grijalva, and Rivera walked into a room off the game room and defendant closed the door at approximately 4:21 a.m. They exited the room a few minutes later, and defendant and Rivera left the business in the white vehicle.[19] Defendant messaged Ramos that they were on their way at 4:29 a.m. Ramos responded, "Tell me when your [*sic*] outside." Video shows that Grijalva left the business at 4:44 a.m. At 4:51 a.m., defendant messaged Ramos, "We pulling up."

The business surveillance cameras show that at approximately 6:58 a.m., Ribeiro and Ramos returned to the business dressed the same as the prior evening. Ramos and Ribeiro entered the game room and stood at the office occupied by Eric and another

---

[18]  During the time defendant was at the business, he wore a white T-shirt but no jacket or sweatshirt.

[19]  Rivera and defendant's fingerprints were later found on the vehicle.

13.

individual. Ramos and Ribeiro then walked around the game room, stood in the front room while looking out the window, and returned to the game room.

At 7:03 a.m., two men wearing hooded sweatshirts walked past the surveillance camera at the residence on Niles and arrived at the front door of the business at 7:04 a.m.[20] One individual entered the business while the other waited outside. The individual who entered the business greeted Ramos and Ribeiro in the game room and left with them shortly thereafter. The individual who entered the business resembled defendant and dressed similarly, except wore a hooded sweatshirt with large white writing on the front. They exited the business at 7:05 a.m., and Eric identified Ribeiro and Ramos as they walked past the surveillance residence on Niles Street.

### B. Video Just Before the Robbery

Surveillance video from the alley shows the suspects' white vehicle at a convenience store a few blocks from the business at 7:33 a.m. Officers also obtained surveillance footage from three cameras associated with the school district headquarters located at the corner of Baker and Niles Street (the district building). In relation to the business, the district building was located on the opposite side of Baker Street and across Niles Street (on the far corner across from the taco shop). Surveillance footage from one of the district cameras shows the district parking lot (located across from the auto shop on Niles Street) and a portion of Niles Street. Another camera pointed away from the district building and shows the area in front of the district building, across the intersection, including the auto shop on the corner and adjacent residence. School district surveillance video shows the white vehicle arrived on Niles Street and parked behind a white van just before the residence with the surveillance camera at approximately

---

[20] This individual was dressed in similar pants and sneakers as worn by defendant earlier that evening, appearing similar in stature.

14.

7:31 a.m.  The surveillance videos show several individuals exited the vehicle, walked down Niles Street, and turned the corner onto Baker Street.

The residential surveillance camera on Niles Street shows four individuals in hooded sweatshirts whom Eric identified as "all of them," referring to defendant, Ramos, Rivera, and Grijalva.  One individual, whom Eric identified as "the one with the ponytail" (Eric had previously identified defendant as having a ponytail), had a tag on the back of his sweatshirt that appeared to indicate it had been turned inside out.

### C. Video of the Robbery

Our review of the videos from the robbery show, as Eric testified, four men entered the business, pointed guns at him, took his firearm, and then defendant held Eric at gun point as the other individuals broke into the gaming machines and took money and a walkie-talkie radio from the office.  The robbers leave the business at approximately 7:41 a.m., followed by Eric who ran after them.

### D. Video After the Robbery

The district building surveillance cameras show four men ran from the direction of the business, turned down Niles Street, and continued running as the white vehicle backed up in the same direction.  While Eric chased them, he fired a taser and one of the suspects turned and pointed a firearm at Eric.  Eric then turned and limped away.

The residential camera shows defendant[21] turned and faced the intersection just near the residence and pointed a firearm.  Thereafter, Ramos ran backwards while pointing a firearm toward Baker Street.  Both individuals then turned and ran down Niles Street and away from Baker Street as a third individual, and then a fourth individual, came into view of the camera and ran down the sidewalk and out of view of the camera.

---

[21]    This individual can be identified as defendant during later surveillance video of the suspects' flight, which shows the suspect with long hair and a ponytail (as seen in surveillance video of defendant in the gaming room in the hours before the robbery) and resembling defendant.

The business video surveillance shows that after the shooting, Eric returned to the business, retrieved his firearm and cellphone, and then returned to the corner where the shooting took place. The district building and residence cameras show that the white vehicle was stopped at the intersection and thereafter passed through the intersection at the same time. The business surveillance camera shows Eric running back to, and past, the business while on his cellphone.

Video surveillance from the alley located behind the business and parallel to Niles Street shows the suspects from the other videos ran toward Jose's residence at approximately 7:42 a.m. The video shows that defendant had removed his hood and ran with his ponytail swinging on his back. Ramos's face was turned toward the camera when he came into its view. The video shows Ramos tossed an item to the left side of the alley, then defendant threw something over the fence to the right. The other two suspects ran behind defendant and Ramos, and all suspects entered an adjacent backyard and then jumped into what Jose identified as his backyard. The white vehicle drove past the alley at 7:43 a.m. The video then shows defendant removing his sweatshirt and wearing the white T-shirt he had worn while gaming at the business earlier. The men can be seen entering the back door of the residence. Surveillance cameras show that the white vehicle, at approximately 7:45 a.m., drove down Niles Street, at the intersection of Niles and Baker streets, and then drove past the alley.

### E. Facebook Location Information

Gavin testified that the Facebook records he obtained from Ramos's and defendant's accounts included latitude and longitude information for each message, which documented user locations when messaging. Facebook records show that at approximately 3:52 a.m., defendant was using his account in the area of the business as confirmed by the business's video surveillance. Facebook records show that defendant used his account at approximately 7:49 a.m. in the area of Jose's residence. These

16.

records also show that defendant had earlier used his account at approximately 6:41 a.m. in the area of the residence where Grijalva was arrested two days later and at 7:26 a.m. from the area of Rivera's residence.

## F. Gang Testimony

Officer Ian Jones of the Bakersfield Police Department testified as an expert on Bakersfield criminal street gangs. The predominant criminal street gangs in Bakersfield identify as southerners or Sureños and have an allegiance to the Mexican Mafia, including the Loma Bakers. The Loma Bakers have an established territory in Bakersfield, and members use hand signs representing the letters "L" and "B" to identify themselves. Subsets of the Loma Bakers include Hillside and Hillside Primos. Members of the Loma Bakers often greet each other as "ele," which represents the Spanish pronunciation of the letter "L." Members of the Loma Bakers are expected to commit crimes to benefit the gang, also referred to as "putting in work," to show their allegiance and loyalty to the gang. The primary crimes committed by Loma Bakers gang members are robbery, attempted murder, and weapons offenses. The gang will benefit either monetarily or by increasing its reputation and power. The gang instills fear in the community so that individuals will refrain from contacting the police or cooperating against the gang members.

The Loma Bakers rival with the Colonia Bakers and other gangs and ally with gangs including the Eastside Bakers. The business is located within the territory of both the Eastside Bakers and the Loma Bakers. Members of different gangs, sometimes even rival gangs, will commit crimes together.

To prove that Loma Bakers engaged in a pattern of gang activity, the prosecution presented testimony and certified convictions that a Loma Bakers member was in possession of a firearm in 2014, that another Loma Bakers member and a Varrio Bakers

member had taken or driven a stolen vehicle in 2015, and that two Loma Bakers members committed robbery and burglary in 2017.

The prosecution also presented evidence of other law enforcement contacts with Ramos, Rivera, and Grijalva, which did not describe any crimes but concerned their association with other gang members and observations of their tattoos. Only one of the contacts involved defendant, and the evidence showed that defendant was stopped in a vehicle with another Loma Bakers member in 2015. Evidence also showed that defendant had "E" and "S" tattoos on his face and hands and "TWK" on his face. "TWK" is a tattoo used only by Eastside Bakers members.

Jones opined that defendant was an Eastside Bakers member and a Loma Bakers associate. Jones also opined that Ramos and Grijalva were Loma Bakers members based upon their tattoos, associations, and police contacts.[22] Jones testified his final opinion[23] was that the crimes in this case benefited, and were committed in association with, the Loma Bakers criminal street gang because they were committed in Loma Bakers territory, the gang derived the financial benefit, Loma Bakers members organized the robbery, a Loma Bakers member provided permission for the robbery, and the proceeds were found in a Loma Bakers member's residence.

A defense expert disagreed with Jones that a member of a gang, such as Rivera, could be also an associate of a rival gang. He also testified that gang tattoos do not indicate current membership in a gang and are sometimes merely representative of the geography where one lives. The expert explained that gang members commit crimes for personal reasons that do not benefit the gang and concluded that the robbery in this case did not benefit a gang. A defense investigator testified that Jones did not feel

---

[22] Jones testified that Ribeiro was a Loma Bakers associate but later testified that she was a Loma Bakers member based upon her participation in the instant offense.

[23] Jones testified to different opinions at different times during the trial, and he explained that certain information was not known to him at the time of the earlier opinions.

18.

comfortable with Jones's testimony and Jones intended to ask the prosecutor to dismiss the gang enhancements. Jones later told the expert that Jones failed to convince the prosecutor to drop the charges.

## DISCUSSION

**I.    Even if amendments to section 1109 are retroactive, failure to bifurcate the gang enhancements in this case was harmless.**

Defendant argues that the bifurcation requirement created by section 1109 applies retroactively to his conviction, which is not yet final. He further argues that the failure to bifurcate requires that we reverse the entire judgment or, if not, at least the attempted murder charge, so that his charges may be tried in a bifurcated proceeding in which the jury will first deliver a verdict on the underlying charges without being exposed to the evidence relating to the gang enhancements. The People disagree on both points. We conclude any failure to bifurcate the gang allegations was harmless; thus, reversal of the underlying convictions is not required.

### A.    Background

#### 1.    *Defendant's motion to bifurcate*

Defendant moved to bifurcate trial on the gang enhancements and joined in the same motion made by his codefendants. The prosecutor objected, in part, because gang evidence was relevant to the conspiracy charge relating to non-gang substantive crimes. The trial court initially granted the motion. However, while hearing in limine testimony from Jose (relating to a defense motion to exclude Jose's identification of Ramos), the trial court indicated that it would revisit its decision once Jose completed his testimony. The reporter's transcript does not include any discussion to explain the trial court's decision to revisit the bifurcation issue, however, during later argument, defense counsel commented that the trial court had provided them with the case of "*People v. Martinez*" (italics added), wherein a witness appeared too afraid to testify due to Martinez's gang membership.

19.

The prosecutor argued that Jose remembered some very specific facts of the day in question but testified that he did not remember identifying the suspects and could not remember numerous facts relating to his encounter with the suspects. In addition, during his original interview with police, Jose expressed reluctance to provide any information for fear of retaliation. The trial court agreed that Jose's testimony and prior interview could be interpreted as being affected by his fear of the gang, vacated its prior ruling, and denied all defendants' motions to bifurcate the gang enhancements and motion to sever the gang charges.

### 2. Assembly Bill No. 333 requiring bifurcation

After defendant's trial, effective January 1, 2022, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) amended section 186.22 (Stats. 2021, ch. 699, § 4) and added section 1109 (Stats. 2021, ch. 699, § 5) to the Penal Code. Section 1109, subdivision (a) provides that, upon request by the defense, a gang enhancement charged under subdivision (b) or (d) of section 186.22 shall be tried separately after determination of the defendant's guilt of the underlying charge. Section 1109, subdivision (b) also provides that a violation of section 186.22, subdivision (a) shall be tried separately from all other charges that do not require gang evidence as an element of the offense.

### B. Applicable Law

As our Supreme Court has recently noted, case law is split on the question of whether section 1109 applies retroactively to convictions that are not yet final. (*People v. Tran* (2022) 13 Cal.5th 1169, 1208 (*Tran*).) Some published opinions have held that section 1109 is not retroactive. (See, e.g., *People v. Boukes* (2022) 83 Cal.App.5th 937, 948 [majority holding § 1109 is not retroactive; concurrence holding it is retroactive], review granted Dec. 14, 2022, S277103; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65 [same], review granted Oct. 12, 2022, S275341; *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090). Other published opinions, including

our own, have held that section 1109 is retroactive. (See, e.g., *People v. Montano* (2022) 80 Cal.App.5th 82, 108; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1130 (*Ramos*); *People v. Burgos* (2022) 77 Cal.App.5th 550, 564–569 [majority holding § 1109 is retroactive; dissent holding it is not retroactive], review granted July 13, 2022, S274743.)

In *Tran*, our Supreme Court found it unnecessary to take a position on whether section 1109 applies retroactively to convictions that are not yet final, as any error in failing to bifurcate the trial of the gang enhancements was harmless. (*Tran*, *supra*, 13 Cal.5th at p. 1208.) As we will explain, we take the same approach here. Even assuming, without deciding, that section 1109 applies retroactively, the failure to bifurcate the trial of the gang enhancements was harmless error.

Defendant's opening brief was filed prior to our Supreme Court's issuance of *Tran*, and he argues that the failure to bifurcate the trial of the gang enhancements constituted structural error that is not amenable to harmless error review and is therefore reversible per se. Acknowledging that his position was rejected in *Tran*, defendant preserves his argument in his reply brief. However, we are bound by *Tran* in which our Supreme Court rejected Tran's "contention that the failure to bifurcate constitutes structural error." (*Tran*, *supra*, 13 Cal.5th at p. 1208.) In most instances, when an error is one of state law, reversal is not warranted unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached. (*People v. Watson* (1956) 46 Cal.2d 818, 836–837; *People v. Lewis* (2021) 11 Cal.5th 952, 973 ["Typically, when an 'error is purely one of state law, the *Watson* harmless error test applies.' "].)

The now-existing requirement to bifurcate gang enhancements arises from a state-law statute (§ 1109); a failure to follow section 1109 therefore constitutes an error of state law. As *Tran* recognized, certain errors of state law may require the application of the

21.

*Chapman*[24] harmless error standard if they rise to federal constitutional error under the due process clause by rendering the trial fundamentally unfair. (*Tran*, *supra*, 13 Cal.5th at p. 1209, citing *People v. Partida* (2005) 37 Cal.4th 428, 439.) However, like the defendant in *Tran*, defendant here has not persuaded us that the failure to bifurcate the gang enhancements created a fundamentally unfair trial within the meaning of the federal due process clause. (*Tran*, at p. 1209 [holding that "the prosecutor's use of the gang evidence here did not render the trial 'fundamentally unfair' "].) The trial was not fundamentally unfair due to the failure to bifurcate because, as we discuss, most of the gang evidence presented at trial was relevant to the underlying charges and the limited amount of evidence relevant only to the gang enhancements was not particularly inflammatory.

As in *Tran*, we apply the *Watson* harmless error standard. (See *Tran*, *supra*, 13 Cal.5th at p. 1209.)

### C. Analysis

Under the *Watson* harmless error standard, we conclude that there is no reasonable probability of a more favorable outcome in the absence of the gang evidence that would not have been presented had the gang allegations been bifurcated. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.) First, as in *Tran*, "[t]he case for guilt here was strong." (*Tran*, *supra*, 13 Cal.5th at pp. 1209–1210.) Eric identified defendant as one of the robbers and Jose identified defendant as accompanying Ramos, Grijalva, and Rivera to his residence immediately after the robbery. In addition, the surveillance video evidence is the strongest evidence that defendant participated in the crime as it clearly shows defendant's identity at the business in the hours preceding the robbery and his presence in the business approximately one-half hour before the robbery. These images of defendant, when compared to the robber who held Eric at gunpoint, strongly indicate

---

[24] *Chapman v. California* (1967) 386 U.S. 18, 26.

22.

that defendant was that robber. In addition, the surveillance video from the alley shows defendant, unmasked, running with the other robbers. Lastly, defendant used Facebook to message Ramos that he would participate in robbing the business.

Defendant argues that Eric's testimony was the only evidence that defendant shot at Eric or committed attempted murder and this testimony was contradicted by the physical evidence that Eric testified that defendant carried a .22-caliber firearm and officers recovered only nine-millimeter and .45-caliber casings. We cannot agree that these facts detract from the overwhelming nature of the evidence. While in the business, defendant threatened to blow off Eric's head. Although Eric testified that defendant used a .22-caliber firearm inside the business, Eric testified that defendant possessed Eric's nine-millimeter Glock after disarming Eric and then fled the business while still possessing it. The surveillance video shows all suspects leaving the business, and their hands appear free of firearms, indicating the firearms had been pocketed. The residential surveillance video unmistakably depicts defendant aiming a firearm at Eric for several seconds as he runs backward, and it is not reasonable to believe that defendant pointed the weapon without firing it while his accomplices were shooting. While no .22-caliber bullet casings were recovered, defendant could have fired the nine-millimeter Glock he took from Eric while shooting at Eric, a reasonable inference supported by officers' recovery of a nine-millimeter hollow-point bullet from the area of the shooting, which was the same type of bullet Eric testified he had loaded into his Glock. Therefore, the physical evidence does not refute Eric's testimony.

We do not agree that the only evidence of defendant's guilt was Eric's testimony, or that impeaching testimony refuted his testimony as a matter of law. The majority of Eric's testimony was corroborated by the surveillance video. The evidence showed that Eric likely erred in concluding that the robbers got into the white vehicle after the robbery, failed to identify Ramos at the hospital, and incorrectly described Ribeiro's clothing. The evidence also showed that Eric accepted pay without paying taxes, worked

23.

at an unlicensed gaming business, and may have promised to send Ramos to prison for life. However, the video did support Eric's testimony that he saw defendant and his accomplice for several hours before the robbery and would have been familiar with defendant's clothing and stature. The video surveillance shows defendant pointing a firearm at Eric and running from the robbery.

Furthermore, "nothing in Assembly Bill 333 limits the introduction of gang evidence … where the gang evidence is relevant to the underlying charges." (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132.) "The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.) Gang evidence—" 'including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime.' " (*Ibid*., quoting *People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) In this case, "[e]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness," and "[a]n explanation of the basis for the witness's fear is likewise relevant to [their] credibility." (*People v. Burgener* (2003) 29 Cal.4th 833, 869.)

The trial court ultimately denied the motion to bifurcate because Jose expressed reluctance to cooperate with police during his initial interview and, during his trial testimony, repeatedly claimed that he could not remember the events or his statement to police even after reviewing the video of his initial interview. The gang evidence, including the expert testimony regarding the gang's purpose in instilling fear in the community to discourage witnesses from cooperating with law enforcement, was relevant to Jose's credibility to explain his reluctance to testify and failure to identify defendant at trial.

" 'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible.' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 773, citing *People v. Burgener*, *supra*, 29 Cal.4th at p. 869; see CALCRIM No. 1403; accord, *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168–1169 [gang evidence may be relevant to witnesses' reluctance to testify and inconsistent statements]; *People v. Harris* (1985) 175 Cal.App.3d 944, 957 ["The trial court specifically and correctly found the evidence of gang membership to be admissible on the issue of credibility."]; see generally *Tran*, *supra*, 13 Cal.5th at p. 1209 ["We have held that a trial court is entitled to admit evidence demonstrating a fear of testifying."]; *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449–1450 ["Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible. [Citation.] It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible."].) Thus, even if section 1109 required bifurcation of the gang enhancements, it is likely some, though not all, of the evidence of defendant's gang membership would have come in at a trial on the other substantive offenses. (See *Hernandez*, *supra*, 33 Cal.4th at pp. 1049–1050 ["To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary."]; *Samaniego*, at p. 1167 ["evidence related to gang membership is not insulated from the general rule that all relevant evidence is admissible if it is relevant to a material issue in the case other than character, is not more prejudicial than probative, and is not cumulative"].)

Additionally, although the robbers did not exploit their gang membership to commit the crime, we believe the gang evidence was relevant to the crime of conspiracy to commit assault with a firearm and robbery in violation of section 182. The prosecutor was required to prove defendant specifically intended to agree or did agree to commit

those crimes, that he intended that one or more of the other robbers would commit those crimes, and at least one of them committed an overt act to accomplish the robbery. (§ 182, subd. (a); *People v. Morante* (1999) 20 Cal.4th 403, 416.) "[C]ommon gang membership may be part of circumstantial evidence supporting the inference of a conspiracy. [Citation.] The circumstances from which a conspiratorial agreement may be inferred include 'the conduct of defendants in mutually carrying out a common illegal purpose, the nature of the act done, the relationship of the parties [and] the interests of the alleged conspirators .…' " (*People v. Superior Court* (*Quinteros*) (1993) 13 Cal.App.4th 12, 20–21, first bracketed insertion added.)

Additionally, the jury was given a limiting instruction regarding its consideration of the gang evidence. Specifically, the court instructed the jury with CALCRIM No. 1403 as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements charged, or the defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts or information relied on by an expert witness in reaching their opinions. [¶] You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he or she has a disposition to commit crime." We presume the jury followed these instructions. (See *People v. Franklin* (2016) 248 Cal.App.4th 938, 953 ["We presume that the jury followed these limiting instructions [regarding considering gang evidence for a limited purpose], and there is nothing in this record to rebut that presumption."].)

We note some of the gang evidence, including evidence of the predicate offenses of other gang members, may not have been admissible in a bifurcated trial. Nevertheless, this does not change our conclusion. Here, none of the predicate offenses involved defendant, the predicate offenses were no more inflammatory than the charged offense of

26.

attempted murder, and no evidence was introduced as to the criminal activities of defendant's own gang, the Eastside Bakers. Furthermore, the three predicate acts were proved mostly by abbreviated testimony of law enforcement witnesses and conviction records that merely recited the charges. Therefore, we do not conclude that the other gang evidence that might not have been admitted had the trial been bifurcated likely biased the jury against defendant on the question of guilt.

As discussed herein, the trial court provided a limiting instruction to the jury regarding its consideration of the gang evidence. Perhaps the most significant indication that the jury followed this instruction lies in its verdicts. The jury convicted Ramos of the same charges and found true the same enhancements as defendant. However, the jury was unable to reach a verdict as to count 4, which charged Ramos with participating in a criminal street gang. The jury acquitted Ribeiro of assault with a firearm (count 3) and failed to reach a verdict as to the remaining three charges against her. The jury also failed to reach a verdict as to any of the charges against Grijalva. Gang evidence was introduced as to the other defendants, but the jury's verdict shows that it followed the trial court's instructions, evaluated the evidence, and was not unfairly prejudiced against defendant based upon the gang evidence. (See *Ramos*, *supra*, 77 Cal.App.5th at pp. 1131–1132 ["Any inference of prejudice resulting from the gang evidence is dispelled by the fact the jury acquitted all the defendants of attempted murder and could not reach a verdict on the attempted voluntary manslaughter charges."].)

Based upon the strength of the evidence of defendant's guilt, the relevance of much of the gang evidence in a trial on the underlying charges, the admonitions to the jury, and the jury's failure to convict of all charges as to all other defendants, we cannot conclude defendant was prejudiced by the failure to bifurcate the gang allegations from the other charges. (See *Hernandez*, *supra*, 33 Cal.4th at p. 1051 ["Any evidence admitted solely to prove the gang enhancement was not so minimally probative on the charged

27.

offense, and so inflammatory in comparison, that it threatened to sway the jury to convict regardless of defendants' actual guilt."].)

We conclude that it is not reasonably probable that the outcome of the trial on the underlying charges would have been different in the absence of the gang evidence that would not have been otherwise admissible. Even assuming section 1109 is retroactively applicable in this case, the failure to bifurcate the trial of the gang enhancements was not prejudicial error.

## II.     The gang enhancements must be reversed following the passage of Assembly Bill 333.

Section 186.22 provides for enhanced punishment when a defendant is convicted of an enumerated felony committed "for the benefit of, at the direction of, or in association with a criminal street gang." (§ 186.22, subd. (b)(1).) Defendant's jury found true the gang enhancements (§ 186.22, subd. (b)(1)) as to counts 1, 2, 3, 5, and 6 and gang-related firearm enhancements (§ 12022.53, subd. (e) as to counts 1 and 2.

Effective January 1, 2022, Assembly Bill 333 amended section 186.22 to require proof of additional elements to establish gang offenses and enhancements. (Stats. 2021, ch. 699, § 4; see § 186.22, subd. (e)(1).) Defendant contends that the amendments to section 186.22 apply retroactively to his case and that we must reverse the true findings on his gang and gang-related firearm enhancements because he was convicted under a prior version of the law. The People concede that the amendments apply retroactively. We agree and reverse the true finding on the gang enhancements and gang-related firearm enhancements and remand for retrial.

The parties agree amendments to section 186.22 altered the requirements necessary to prove the substantive gang offense and gang enhancements and, therefore, operate retroactively. (See *In re Estrada* (1965) 63 Cal.2d 740; *Tran*, *supra*, 13 Cal.5th at pp. 1206–1207 ["[*In re*] *Estrada* applies to statutory amendments 'which redefine, to the benefit of defendants, conduct subject to criminal sanctions.' " " 'Assembly Bill 333

28.

essentially adds new elements to the substantive offense and enhancements in section 186.22.…' " "These changes have the effect of 'increas[ing] the threshold for conviction of the section 186.22 offense and the imposition of the enhancement,' with obvious benefit to defendants like Tran."].) Accordingly, it is undisputed defendant may seek the benefit of amendments to section 186.22.

Both parties agree the case should be remanded to afford the prosecution an opportunity to retry the gang-related charges and enhancements, as do we. "The proper remedy for this type of failure of proof—where newly required elements were 'never tried' to the jury—is to remand and give the People an opportunity to retry the affected charges." (*People v. E.H.* (2022) 75 Cal.App.5th 467, 480; see *People v. Salgado* (2022) 82 Cal.App.5th 376, 380–381 [vacating gang enhancements and remanding for possible retrial at the election of the People].)

The gang enhancement (§ 186.22, subd. (b)(1)) on counts 1, 2, 3, 5, and 6 and gang-related firearm enhancements (§ 12022.53, subd. (e)) on counts 1 and 2 are reversed, and the matter is remanded. On remand, the People may elect to retry the enhancements under the current gang enhancement law or, instead, they may proceed directly to resentencing.

## III.   Section 654 arguments.

### A.      Remand for Resentencing Under Section 654

The trial court stayed the sentences and enhancements for counts 3, 5, and 6 pursuant to former section 654. Defendant argues that his case must be remanded for resentencing so that the trial court may exercise its discretion under recent amendments to section 654. Defendant contends that because his case is not yet final on appeal, he is entitled to the benefit of section 654, as amended, pursuant to the principles of retroactivity set forth in *In re Estrada*, *supra*, 63 Cal.2d 740. The People agree that we

should remand the matter for resentencing and permit the trial court to reconsider its sentencing choices under the recent amendment.

At the time of defendant's sentencing, former section 654, subdivision (a) required the trial court to punish defendant in accordance with the provision that provided for the longest potential term of imprisonment. (Stats. 1997, ch. 410, § 1, p. 2753.) The statute "expressly prohibits separate punishment for two crimes based on the same act but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord, *People v. Harrison* (1989) 48 Cal.3d 321, 335.) Effective January 1, 2022, Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518) amended section 654 to provide the trial court with the discretion to choose the count for which it will impose punishment. (Stats. 2021, ch. 441, § 1.)

However, we are remanding this matter for resentencing in light of amendments to section 186.22. "[T]he full resentencing rule allows a [trial] court to revisit all prior sentencing decisions when resentencing a defendant." (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425; accord, *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate' "].) A court conducting a full resentencing may "exercise its sentencing discretion in light of … changed circumstances." (*People v. Navarro* (2007) 40 Cal.4th 668, 681.) This, of course, includes any new legislation delimiting that sentencing discretion. (See *Valenzuela*, at p. 425 ["[I]n a Proposition 47 resentencing, the trial court not only must revisit its prior sentencing decisions, it also must decide whether the factual basis for an enhancement has been abrogated by the redesignation of a felony conviction as a misdemeanor."]; *People v. Jones* (2022) 79 Cal.App.5th 37, 45–47 [holding the need to apply amended sections 1170, subdivision (b) and 654 to the defendant's sentence warranted a remand for a full resentencing].)

We presume the trial court will comply with current sentencing laws when making its full resentencing decision. We therefore need not and do not reach the merits of defendant's claim.

**B.      Trial Court's Decision to Order Robbery Sentence be Served Consecutive to Defendant's Sentence for Attempted Murder**

The trial court ordered that defendant's robbery sentence be served consecutive to the sentence for attempted murder based upon its conclusion that the robbery had been completed at the time that defendant attempted to kill Eric. Defendant argues because a robbery is not complete until the perpetrator reaches a place of safety, the trial court erred by not staying his robbery sentence. The People acknowledge that the trial court erred in finding that the robbery was completed at the time that defendant attempted to kill Eric, but argue that we should remand to permit the trial court to exercise its sentencing discretion in light of a proper understanding of when a robbery is complete and permit the trial court to make findings as to whether defendant had separate intents and objectives that would warrant consecutive sentences. The People concede that defendant is entitled to resentencing under section 654.

We agree that the trial court erred in finding that the robbery was completed before the attempted murder. A robbery is not complete until the perpetrators reach "a place of temporary safety." (*People v. Young* (2005) 34 Cal.4th 1149, 1177; see *People v. Cooper* (1991) 53 Cal.3d 1158, 1165.) In this case, defendant was still running down the street while being chased by Eric when defendant attempted to kill Eric. Therefore, the trial court either legally erred by not recognizing this legal proposition, or factually erred by finding that defendant's flight on Niles Street was a place of temporary safety.

However, defendant further argues that the trial court should have stayed the robbery sentence pursuant to section 654. Section 654 generally precludes punishment for multiple crimes arising from a single course of conduct. (See *People v. Jones* (2012) 54 Cal.4th 350, 358.) It also prohibits multiple punishments for an indivisible course of

31.

conduct that violates more than one provision of law. (*People v. Correa* (2012) 54 Cal.4th 331, 336.) " 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.' " (*People v. Britt* (2004) 32 Cal.4th 944, 951–952, disapproved on another ground in *People v. Correa*, *supra*, 54 Cal.4th 331, 334.) "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once." (*People v. Harrison*, *supra*, 48 Cal.3d at p. 335.)

"The question of whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination." (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113.)

In this case, the trial court did not make explicit findings as to defendant's objective or intent in shooting at Eric and relied on the erroneous finding that the robbery was complete at the time of the attempted murder in making its decision to run the sentences consecutively. Defendant argues that the robbery was ongoing at the time of the attempted murder, which was incidental to the robbery. The People respond that defendant could have fired at Eric in retaliation for Eric firing his taser, especially after Eric convinced defendant to allow Eric to retain possession by downplaying its ability to injure the robbers. Separate punishment may be imposed for an assaultive crime committed during the course of a robbery which involves an act of "gratuitous violence." (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 191 ["Once robbers have neutralized any potential resistance by the victims, an assault or attempt to murder to facilitate a safe escape, evade prosecution, or for no reason at all, may be found by the trier of fact to have been done for an independent reason."]; *People v. Sandoval* (1994) 30 Cal.App.4th 1288, 1300 [gratuitous violent act after attempted robbery has been completed may be punished separately].)

32.

We agree that the question of whether defendant harbored an intent separate from ensuring completion of the robbery when he attempted to kill Eric is a determination to be made in the first instance by the trial court. Because we are remanding for a full resentencing, we do not address the merits of this claim and defendant may raise his argument at his resentencing. The trial court should make any factual findings necessary for resolution of this issue and exercise its discretion with a proper understanding of the law.

**IV.** **The trial court erred when, in response to a jury question, it instructed the jury that defendant's actions need only be a substantial factor in causing injury for a true finding as to the enhancement for personal infliction of great bodily injury.**

**A.** **Background**

Counts 3 and 5 included an enhancement for the personal infliction of great bodily injury (§ 12022.7). The trial court instructed the jury with CALCRIM No. 3160, which provided in relevant part: "If you find the defendants guilty … you must then decide whether for each crime the People have proved the additional allegation that the defendants personally inflicted great bodily injury on Eric … in the commission of that crime." Regarding the section 12022.53 enhancements in counts 1 and 2, the trial court instructed the jury with CALCRIM No. 1402 that "[t]here may be more than one cause of great bodily injury. [¶] An act causes injury only if it is a substantial factor in causing the [in]jury. A substantial factor is more than a trivial or remote factor; however, it does not need to be the only factor that causes the injury."

In closing argument, the prosecutor argued that the jury could find defendant personally inflicted great bodily injury even if it could not determine whose bullets hit Eric if it determined that defendant personally used physical force on Eric at the same time as an accomplice, and the amount of force used by defendant alone could have

33.

caused the injury or was sufficient in combination with the force of others to cause the injury.

During deliberations, the jury submitted a note asking whether CALCRIM No. 1402's language that an act needed to be a substantial factor in causing the injury (but not being the only cause) applied only to the section 12022.53 enhancement or to any enhancement or charge involving great bodily injury. After consultation with counsel, the trial court responded to the jury in writing: "The definition of 'G.B.I[.]' or 'Great Bodily Injury' is the same. [¶] Please also refer to Instruction[s] 3160 and 604. 604 has the definition of G.B.I. [¶] 'The definition of GBI' is the same for any crime or enhancement where 'GBI' is referenced." (Some capitalization omitted.)

The following day, the jury submitted the following note: "We feel our question previously was misunderstood. Our question pertains to the following paragraph. [¶] 'There may be more than one cause of great bodily injury. An act causes injury only if it is a substantial factor in causing the injury. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the injury.' [¶] We want to know if the above paragraph applies to all instances of GBI. We ask because the above paragraph does not appear in instruction 3160. The above paragraph only appears in instruction 1402 … and we are unsure if that paragraph applies only to that enhancement or not." After consultation with counsel, the trial court responded in writing: "Yes, that paragraph applies to all instances of GBI allegations." (Some capitalization omitted.)

The jury found true section 12022.7 enhancements as to counts 3 and 5.

**B.      Standard of Review and Applicable Law**

A court also has "a general obligation to 'clear up any instructional confusion expressed by the jury.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 802.) This obligation arises under section 1138, which provides that if deliberating jurors "desire to be

34.

informed on any point of law arising in the case, … the information required must be given" to them in court.  (§ 1138.)  Thus, " '[w]hen a jury asks a question after retiring for deliberation, "[Penal Code] [s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law." ' " (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016, first bracketed insertion added.)

In general, errors under section 1138 are reviewed for an abuse of discretion. (*People v. Lua*, *supra*, 10 Cal.App.5th at p. 1016.)  The abuse-of-discretion standard only applies to "the decision to provide [or not provide] further instructions in response to an inquiry." (*People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4.)  "If a supplemental instruction is given, … its correctness presents a question of law that we review de novo." (*Ibid*.)

Section 12022.7, subdivision (a), applies to any person who (1) personally inflicts, (2) great bodily injury, (3) on any person other than an accomplice, (4) in the commission of a felony or attempted felony.  (§ 12022.7, subd. (a).)  For a true finding under section 12022.53, subdivision (d), the jury must find that, during the commission of an offense specified in section 12022.53, subdivision (a), a defendant (1) personally and intentionally discharged a firearm and (2) proximately caused (3) great bodily injury as defined in section 12022.7, or death (4) to any person other than an accomplice. (§ 12022.53, subd. (d).)  One of the critical differences between the two enhancements is that while section 12022.53, subdivision (d) applies to those who *proximately* caused great bodily injury, section 12022.7, subdivision (a) applies only to those who *personally* inflicted great bodily injury.  The term "personally inflicted" has a distinct legal meaning, which is different from proximate cause.  (*People v. Cole* (1982) 31 Cal.3d 568, 572.) "Proximately causing and personally inflicting harm are two different things."  (*People v. Bland* (2002) 28 Cal.4th 313, 336.)  A defendant "personally" inflicts great bodily injury if he directly causes the injury—that is, if the defendant "himself" actually "inflicts the injury[ ]" by "directly perform[ing] the act that causes the physical injury to the victim."

35.

(*Cole*, at pp. 572, 579; see *People v. Modiri* (2006) 39 Cal.4th 481, 495 (*Modiri*) [requiring a "direct physical link between [the defendant's] own act and the victim's injury"].)

Because proximate cause is conduct that is a substantial factor contributing to the injury, and such conduct can set in motion the chain of events that naturally ripened into the injury (see *People v. Bland*, *supra*, 28 Cal.4th at pp. 334–336), it is possible for one who personally and intentionally discharges a firearm to proximately cause great bodily injury without personally inflicting great bodily injury. One example of this would be where a person personally and intentionally discharges a firearm, but the bullet hits a gas can that creates an explosion, and someone is injured while fleeing. (See *People v. Palmer* (2005) 133 Cal.App.4th 1141, 1151–1153 [section 12022.53, subdivision (d) extends to situation where bullet itself does not hit victim, but discharge of firearm is nonetheless the proximate cause of the injury]; see also *People v. Rodriguez* (1999) 69 Cal.App.4th 341, 346, 351 [victim injured after hitting his head while trying to tackle the defendant; the defendant did not personally inflict injury]; *People v. Jackson* (2000) 77 Cal.App.4th 574, 576, 579–580 [victim injured tripping over curb while walking away from the defendant; the defendant did not personally inflict injury].)

## C.    Analysis

Defendant argues that the trial court's responses to the jury's questions were prejudicial error by permitting the jury to find section 12022.7 enhancements true based upon a finding of proximate cause while section 12022.7 requires that defendant's bullets personally caused the injury. Defendant further argues that the evidence is insufficient to prove that defendant personally caused Eric's great bodily injury. The People concede that the trial court's instructions were error and that the error was not harmless. Both parties agree that the proper remedy is to strike the section 12022.7 enhancement, although the People do not address defendant's argument regarding of the sufficiency of

the evidence for the enhancement. We accept the concession that the trial court's instruction was legally erroneous and that we should reverse the finding. However, we do not agree that the evidence was insufficient to support the enhancement should a jury be correctly instructed and will remand with instructions that the prosecutor determine whether to retry the enhancement.

As the prosecutor argued in closing argument, the jury could find defendant personally inflicted great bodily injury even if it could not determine exactly who created a certain injury if it determined that two or more of the defendants personally used physical force on Eric at the same time and the amount of force used by defendant alone could have caused the injury or was sufficient in combination with the force of others to cause the injury.

A defendant "need not be the sole or definite cause of a specific injury" to support a finding that he or she personally inflicted great bodily injury on a victim. (*Modiri*, *supra*, 39 Cal.4th at p. 486.) In cases where more than one person perpetrates an attack, "the evidence is often conflicting or unclear as to which assailant caused particular injuries in whole or part. Thus, … those who participate directly and substantially in a group beating should not be immune from a personal-infliction finding for the sole reason that the resulting confusion prevents a showing or determination of this kind." (*Id*. at pp. 496–497.)

"[P]articipation in a group attack may satisfy sections 1192.7[, subdivision ](c)(8) and 12022.7[, subdivision ](a) where the defendant personally uses force against the victim, and the precise injurious effect is unclear." (*Modiri*, *supra*, 39 Cal.4th at pp. 495–496.) In the context of a group beating, a personal infliction finding can be made "if [the] defendant personally applied force to the victim, and such force was sufficient to produce grievous bodily harm either alone or in concert with others." (*Id.* at p. 497.) Accordingly, where there has been a group assault and it is not possible to determine precisely which person caused which injury, personal infliction of great bodily injury

37.

may be found "if the defendant personally 'appli[ed] unlawful physical force' to the victim," and the physical force used by the defendant was "sufficient to produce great bodily injury either (1) by itself, or (2) in combination with other assailants." (*Id*. at p. 494.)

According to the evidence presented at trial, one bullet passed through Eric's body and was not recovered, and the doctors left the second bullet in Eric's leg to heal. The 11 casings recovered after a thorough search indicated that nine-millimeter and .45-caliber firearms were fired, and the .380-caliber revolver used by another suspect would not eject casings. Eric testified that all the suspects fired at him, and the video shows that at least three defendants, including defendant, turned and pointed firearms after initially running from Eric. Eric testified that Ramos used a nine-millimeter firearm and defendant was armed with a .22-caliber firearm during the robbery. However, Eric testified, and video surveillance confirms, that defendant took Eric's firearm, which Eric testified was a nine-millimeter Glock loaded with hollow-point bullets. Eric also testified, and video surveillance confirms, that defendant took the nine-millimeter Glock when he ran from the business. The video surveillance also shows that the suspects left the business without holding any firearms, yet the district video surveillance shows them pointing the firearms during the escape. Defendant and the other suspects would have had to remove their firearms from concealment to fire at Eric and, at that time, defendant could have decided to use Eric's firearm.

Furthermore, law enforcement recovered 11 casings, consistent with Eric's testimony that each suspect fired two to three times, and also recovered a nine-millimeter hollow-point bullet near the steel gate in the area from which the robbers fired. A reasonable jury could infer that defendant fired the gun that he pointed in the video and that the firearm was Eric's nine-millimeter Glock, as evidenced by the recovery of a nine-millimeter hollow-point bullet.

38.

In *In re Sergio R.* (1991) 228 Cal.App.3d 588, the court held that "where, as here, more than one assailant discharges a firearm into a group of people and 'it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered.' " (*Id*. at pp. 601–602.) Our Supreme Court cited and implicitly affirmed *In re Sergio R.* in *Modiri*, *supra*, 39 Cal.4th 481 when it applied section 12022.7, subdivision (a) in the context of a group assault. (*Modiri*, at p. 496.) A defendant "need not be the sole or definite cause of a specific injury" to support a finding that he or she personally inflicted great bodily injury on a victim. (*Id.* p. 486.) In cases where more than one person perpetrates an attack, "the evidence is often conflicting or unclear as to which assailant caused particular injuries in whole or part. Thus, … those who participate directly and substantially in a group beating should not be immune from a personal-infliction finding for the sole reason that the resulting confusion prevents a showing or determination of this kind." (*Id*. at pp. 496–497.)

"[P]articipation in a group attack may satisfy section[ ] … 12022.7[, subdivision](a) where the defendant personally uses force against the victim, and the precise injurious effect is unclear." (*Modiri*, *supra*, 39 Cal.4th at pp. 495–496.) In the context of a group beating, a personal infliction finding can be made "if [the] defendant personally applied force to the victim, and such force was sufficient to produce grievous bodily harm either alone or in concert with others." (*Id*. at p. 497.) Accordingly, where there has been a group assault and it is not possible to determine precisely which person caused which injury, personal infliction of great bodily injury may be found "if the defendant personally 'appli[ed] unlawful physical force' to the victim," and the physical force used by the defendant was "sufficient to produce great bodily injury either (1) by itself, or (2) in combination with other assailants." (*Id*. at p. 494.)

In this case, while the robbers used different caliber bullets to injure Eric, the bullets that hit Eric were not recovered, and a jury could conclude that while it is not

possible to determine if defendant's bullets hit Eric, the evidence was sufficient to support a finding that defendant personally applied force by firing at Eric, other robbers also fired at Eric, and the act of shooting Eric was of a nature that could have caused great bodily injury by itself. (*Modiri*, *supra*, 39 Cal.4th at pp. 485–486.)

Accordingly, we conclude the evidence would be sufficient to support a properly instructed jury's findings as to a section 12022.7 enhancement.

## DISPOSITION

The true findings on the section 186.22, subdivision (b)(1) gang enhancements, the section 12022.7 great bodily injury enhancement, and the section 12022.53, subdivision (e) gang-related firearm enhancements are reversed as to all counts. The case is remanded to the trial court with directions to (1) give the People an opportunity to retry the enhancements under section 186.22, as amended by Assembly Bill 333 (Stats. 2021, ch. 699, § 4), and sections 12022.7 and 12022.53, subdivision (e), and (2) resentence defendant in a manner consistent with this opinion. Thereafter, the trial court is directed to file an amended and corrected abstract of judgment and transmit copies thereof to the appropriate authorities. In all other respects, the judgment is affirmed.


HILL, P. J.

WE CONCUR:


LEVY, J.


MEEHAN, J.

# APPENDIX

